601 F.2d 429
 1979-2 Trade Cases 62,784
 Gary H. SHERMAN and Vincent Imports, Inc., doing business as
European Motors, Plaintiffs-Appellants and Cross-Appellees.
v.
BRITISH LEYLAND MOTORS, LTD., Leyland Motor Sales, Inc.,
British Leyland Motors, Inc., British Motor Car
Distributors, Ltd., and Peter Satori
Company, Ltd.,
Defendants-Appellees
and
Cross-Appellants.
 Nos. 76-3172, 76-3582.
 United States Court of Appeals,
Ninth Circuit.
 July 24, 1979.
 
 1
 David C. Phillips, Tuckman, Goldstein & Phillips, San Francisco, Cal., John R. Schoemer, Jr., Townley, Updike, Carter & Ridgers, New York City, for British Leyland.
 
 
 2
 Robert L. Gorman, Jeffrey J. Parish, Skornia & Rosenblum, San Francisco, Cal., for Sherman.
 
 
 3
 Appeal from the United States District Court for the Northern District of California.
 
 
 4
 Before BROWNING and CHOY, Circuit Judges, and CHRISTENSEN,* District Judge.
 
 CHRISTENSEN, District Judge:
 
 5
 This is an action for alleged violations of the federal Automobile Dealers' Day in Court Act,[1] and the antitrust laws,[2] and on pendent state claims.[3] The district court granted summary judgment in favor of the defendants on all claims. Presented by plaintiffs' appeal is the broad issue typical for such rulings of whether the pleadings, affidavits and depositions before the district court established as a matter of law that plaintiffs' claims did not justify trial on the merits.[4] The answer, of course, depends upon resolution of ancillary issues. Defendants' cross-appeal involves deposition costs which were disallowed by the trial court.
 
 
 6
 An alphabetized list and description of the parties in the margin[5] may prove useful, since relationships and distinctions among them will be important from the outset.
 
 FACTS OF RECORD
 
 7
 Among facts which affidavits, depositions and admissions before the district court tended to establish were:In 1968 British Leyland took over through merger the business of the principal British automobile makers (excluding General Motors, Ford and Chrysler): British Motor Corporation, manufacturer of Austin, MG and Jaguar automobiles, and Leyland Motor Corporation, maker of Triumph, Rover and Land Rover. British Leyland thereupon became the parent of three separate United States marketing organizations: British Motor Holdings (U.S.A.), Inc., which marketed MG; Leyland Motor Corporation of North America, the importer of Triumph (and at that time Rover); and Jaguar Cars, Inc., importer of Jaguar. These three United States companies were consolidated into British Leyland Motors, Inc. (BLM), on October 1, 1968. BLM continued to operate through three separate divisions handling Jaguar and Triumph, Rover and Austin, and MG, respectively, until 1972, when BLM began actively to implement a program of consolidation of its wholesale distribution system by means of a "Rationalization Program".[6] Under that plan the wholesale distribution of all British Leyland automobiles in the United States was to be handled by a single organization for each territory either Leyland Motor Sales, Inc. (LMS), or some independent distributor.
 
 
 8
 Prior to the consummation of the program LMS, as the wholly-owned subsidiary of BLM, distributed Triumph automobiles, parts and accessories throughout California. Effective October 1, 1973, LMS' distribution rights for Triumph, together with Rover and Land Rover automobiles, were terminated and it no longer did business in southern California. British Motor Car Distributors, Ltd. (BMCD), another defendant-appellee, became the sole distributor of Triumph, along with MG and Jaguar, in a territory centered in southern California. LMS in exchange for its Triumph, Rover and Land Rover distribution rights in southern California became the exclusive distributor for all Leyland automobiles in northern California. This, of course, resulted in BMCD's becoming the Triumph distributor in the Pasadena area where Vincent's business was situated.
 
 
 9
 Vincent had been first franchised to sell the Triumph line on March 15, 1971, at a time when the plaintiff corporation was owned by one Vincent Santangelo. All corporate stock was transferred to Sherman on December 1, 1971. The latter applied to LMS for appointment as a Triumph dealer and received a one-year franchise which expired December 1, 1972. That franchise was renewed by LMS for a second year to expire on December 1, 1973. The franchise was in the form of a "Distributor-Dealer Agreement" which appointed Vincent "as an authorized dealer for new Triumph vehicles, replacement parts, equipment and accessories as offered for sale by the distributor." The agreement read in part:
 
 
 10
 16. Termination. (a) This Agreement shall be deemed canceled, without further action by the Distributor, in the event of the termination or cancellation of the Distributor's Distribution Agreement with British Leyland Motors Inc. or upon the withdrawal for any reason of the right of the Distributor to purchase the Vehicles and to resell the same within the area in which the Dealer is located. The Dealer acknowledges that all of his rights under this Agreement are subordinated to, and conditional upon the continuance of, the ability of the Distributor to supply the Dealer with the Products.
 
 
 11
 (b) Either party may in its full discretion and with or without any cause cancel this Agreement upon not less than 30 days' written notice to the other.
 
 
 12
 (c) The Distributor may at its option terminate this agreement for cause forthwith by giving the Dealer written notice of such termination. It is agreed that any of the following will give the Distributor cause to terminate this Agreement:(1) The death, incapacity, removal, resignation or withdrawal from active participation with the Dealer for any reason of any of the persons listed in the Schedule as principals of dealership (Sherman was listed in that schedule as president and his wife Helga Sherman as vice-president of Vincent).
 
 
 13
 (2) Any sale, transfer, or change by operation of law or otherwise of any substantial interest in the direct or indirect management or ownership of the Dealer, except in the case where the persons referred to in (1) above remain in the active management and substantial ownership of the Dealer. . . .
 
 
 14
 24. Manufacturer and/or Importer Not a Party. Neither British Motor Corporation, Ltd., . . . nor affiliated companies of British Leyland Motor Corporation, Ltd., is a party to this Agreement, and none of them shall be deemed to have assumed any liability or obligation to the Dealer hereunder.
 
 
 15
 A "Distribution Agreement" dated October 1, 1973, between BLM and BMCD in implementation of the Rationalization Program provided in part that BMCD would become the sole distributor in southern California of not only the Austin and MG, but also of the Triumph, Rover, Land Rover and Jaguar lines, and that LMS would become the sole distributor of all of those automobiles in northern California. Paragraph 7 of that agreement read in part:
 
 
 16
 Dealer Organization. (a) It is acknowledged that neither party is the successor-in-interest of the other in the territory to be taken over. Neither party shall be deemed to assume any liability under any dealer agreement of the other, or upon any representation made by the outgoing distributor to any of its dealers which exceeds in scope or otherwise differs from the written dealership agreement. . . .
 
 
 17
 (b) Without the prior consent of the other party, neither BLM (nor LMS) nor the Distributor (BMCD) will renew or extend any dealer agreement now in force, nor will it appoint any new dealer or make any representations to any dealer as to its future status after transfer of distribution has been effected.
 
 
 18
 In an addendum "United States Distributor's Agreement" contemporaneously executed[7] it was stipulated that the distributor would have the sole right to appoint dealers authorized to sell the vehicles at retail ("Authorized Dealers") from places of business located within its area. There was another provision stating: "Nothing contained in this agreement shall limit or restrict the geographic territory within which, or the persons from whom, the Distributor or its Authorized Dealers may sell the Vehicles, parts and accessories."
 
 
 19
 By October 30, 1973, BMCD had taken over LMS' position as distributor of Triumph in the southern California area pursuant to these distribution agreements. On that date, BMCD sent a letter to Vincent and other Triumph dealers informing them that BMCD had been reviewing dealer candidates with the view to establishing a strong dealer network "for the sale of all Triumph's (sic) as well as the other British Leyland lines of cars in the Southern California territory." The recipients were advised that "we have not yet completed the screening process, and will not be able in all cases to announce final dealer appointments for several more weeks." The letter added:
 
 
 20
 In the interim, as an accommodation in these circumstances, we would be happy to process all orders for vehicles and for parts and accessories, to the extent of the available supply, on the same basis as we intend to follow once the dealership appointments have been made. The terms which we will honor are set out in the form of dealership agreement which is enclosed along with this letter, for your review. Unless informed by you that these terms are not acceptable, we shall accept your orders during the interim period on this basis.
 
 
 21
 Please understand that the enclosed form of agreement is not intended to establish a new dealer arrangement with you, or to renew any agreement that has previously been outstanding. This accommodation is intended to apply only as transitional measure, effective for forty-five days from the date of this letter.
 
 
 22
 We are proceeding as quickly as possible to review the candidacy of each potential dealer for the vehicles which we will be distributing and hope to be in a position to announce our appointments in the near future. Thank you for your continuing cooperation, and we look forward to being in touch with you shortly.
 
 
 23
 The recipient was asked to sign an acceptance on the bottom of the letter and return it to BMCD.
 
 
 24
 Sherman, believing that Vincent's relationship with BMCD as a successor to LMS would be governed by the still subsisting franchise agreement with LMS and that the requested acceptance might waive Vincent's rights thereunder, did not sign or return the letter. Vincent continued to receive from BMCD some Triumph automobiles. While it asserts that these did not represent a fair allocation, this contention is not affirmatively supported by the record. In any event, Sherman had the justified impression that Vincent would not be appointed dealer for Triumph automobiles unless it was willing to accept the full Leyland line. He was unwilling to agree to Vincent's full-line representation to the extent that this would involve models which in his judgment were not likely to be profitable and competitive.
 
 
 25
 Defendant-appellee Satori, on the other hand, was willing to accept, and was granted by franchise from BMCD, the full Leyland line, including Triumph, and Vincent's franchise was not renewed by BMCD.
 
 
 26
 Vincent's performance as Triumph dealer under its franchise was appropriate and satisfactory. Had it not been for the Rationalization Program its Triumph franchise again would have been renewed.[8] The nonrenewal of that franchise resulted in the destruction of Vincent's business, which was closed March 15, 1974.
 
 PROCEEDINGS IN DISTRICT COURT
 
 27
 Vincent and Sherman filed this action in the district court on May 5, 1976. The complaint stated, among other things, that commencing at a time unknown to plaintiffs and continuing to the termination of plaintiffs' franchise on or about December 10, 1973, the named defendants, and other persons unknown, engaged in a continuous covert agreement, combination and conspiracy in unreasonable restraint of interstate commerce and trade in the sale of Triumph automobiles, parts and accessories, in violation of section 1 of the Sherman Act; and that they conspired to monopolize and engaged in monopolization of such trade and commerce in violation of section 2 of the Sherman Act. It was further alleged that pursuant to such conspiracy, through termination of plaintiffs' franchise, defendants accomplished the elimination of Vincent as a franchised Triumph dealer and as a viable automobile business.
 
 
 28
 With particular reference to its Dealers' Act claim, it was alleged that the defendants coerced plaintiffs by threats of termination or nonrenewal of plaintiffs' Triumph franchise unless plaintiffs agreed to assign the franchise without consideration to the defendant Satori; and that defendants interfered with plaintiffs' business by arbitrarily and unfairly limiting the number of Triumph automobiles, parts and accessories allocated to them, resulting in loss of good will and profits. Other allegations were that the defendants violated the terms of the Dealers' Act and plaintiffs' franchise by conspiring with each other to eliminate plaintiffs as a franchise dealer for Triumph automobiles unless plaintiffs accepted another automobile line; that plaintiffs were unable to accept such unlawful demands and that as a consequence on or about December 10, 1973, defendants refused to renew the franchise.
 
 
 29
 As to the pendent state claims, there were allegations that among the implied terms and warranties of the franchise was the undertaking of the parties to act in good faith in the performance and renewal of the franchise and that the franchise would be renewed unless good cause existed for nonrenewal. On or about December 10, 1973, as a result of the conspiracy alleged elsewhere in the complaint, defendants, according to the complaint, breached the franchise by unilaterally, without cause, and in bad faith refusing to renew the franchise and refusing to sell to plaintiffs any new Triumph automobiles, parts and accessories. It was asserted also that defendants had represented that Vincent would remain a Triumph dealer as long as it performed its obligations under the franchise, and that such representations were fraudulently made with intent to induce plaintiff to execute and continue the franchise. Compensatory, trebled, and punitive damages, declaratory relief, attorneys' fees and costs were prayed for by plaintiffs on the various claims.
 
 
 30
 Following an extended period of discovery, all of the defendants moved for summary judgment on all claims. On April 12, 1976, the district court, without opinion, granted defendants' motion to dismiss Sherman on the antitrust and state claims for lack of standing to sue. Orders granting summary judgments in favor of the other defendants on the state claims and later on the federal claims followed, again without opinion. Summary judgment dismissing plaintiffs' action as to all claims and in favor of all defendants was formally entered by the clerk on July 21, 1976, in accordance with the district court's rulings. Plaintiffs were taxed costs of $1,792.06, but the court refused to assess against them defendants' costs for deposition copies and the travel and sustenance expense of their counsel in attending depositions outside the forum district. Plaintiffs timely appealed and defendants cross-appealed.
 
 ISSUES
 
 31
 Presented on appeal are the following subsidiary issues on the basis of which we must determine whether the granting of summary judgment against the plaintiffs was justified:
 
 
 32
 I. Did Sherman individually have standing to sue and could Satori or British Leyland be held liable in any event?
 
 
 33
 II. Did genuine issues of material fact exist to preclude summary judgment on:
 
 
 34
 A. Plaintiff's Dealers' Act claim?
 
 
 35
 B. Plaintiff's claims under section 1 of the Sherman Act or related claims regarding an illegal tying arrangement in violation of section 3 of the Clayton Act?
 
 
 36
 C. Plaintiff's claims under section 2 of the Sherman Act?
 
 
 37
 D. Any of the pendent claims?
 
 
 38
 III. On defendant's cross-appeal, did the district court abuse its discretion in denying defendants the cost of transcript copies and the travel expense in question?
 
 STANDARD FOR REVIEW
 
 39
 Since all of the plaintiffs' claims were resolved against them by summary judgment, the burden was upon the defendants to show the absence of any genuine issue of material fact which would preclude a finding by reasonable jurors for the nonmoving party; and, in determining whether the burden was met, we must draw all reasonable inferences of fact in favor of the plaintiffs. Marquis v. Chrysler Corp., 577 F.2d 624, 631 (9th Cir. 1978); Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d 674, 683 (9th Cir.), Cert. denied, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976); See also Stansifer v. Chrysler Motors Corp., 487 F.2d 59, 63 (9th Cir. 1973).
 
 
 40
 Among recognized corollary rules is that if the nonmoving party has raised a genuine issue of material fact, and the evidentiary matter in support of the motion does not establish the absence of such issue, summary judgment must be denied even though no opposing evidentiary matter is presented. See Adickes v. S. H. Kress & Co., 398 U.S. 144, 159-60, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); Dalke v. Upjohn Co., 555 F.2d 245, 248 (9th Cir. 1977). Substantial evidence to raise a triable issue is more than a mere scintilla, Marquis v. Chrysler Corp., 577 F.2d at 631, but the moving party has the burden of clearly demonstrating the absence of any genuine issue as to the existence of each material fact which under applicable principles of substantive law would be required to support a judgment in its favor. United States v. Dibble, 429 F.2d 598, 601 (9th Cir. 1970).
 
 
 41
 While the basic structure for claims and defenses is quite clearly defined by the contract documents, the questions of motive, purpose and economic effects beyond matters of admission and uncontroverted contentions do not readily lend themselves to summary resolution. See Calnetics Corp. At 684. See also United States v. Yellow Cab Co., 338 U.S. 338, 341, 70 S.Ct. 177, 94 L.Ed. 150 (1949).
 
 
 42
 I. SHERMAN'S LACK OF STANDING; DISTAL DEFENDANTS
 
 
 43
 There are, at best, enough complexities in this case to commend the elimination as early as possible of any parties and related issues patently without significance or substance. The plaintiff Sherman is one such party because of his lack of standing. The defendant Satori is another because of the rather obvious absence of merit in the claims against him, and the issues with reference to British Leyland also appear insubstantial.
 
 
 44
 No claim or showing has been made that Vincent during material times did not maintain its corporate existence separate and apart from Sherman, notwithstanding that the latter was president and sole stockholder of the corporation. The franchise in question was signed by Sherman for and on behalf of the corporation. No rights or responsibilities were reserved expressly in any of the written documents in favor of, or against, Sherman. It is true that the franchisor recognized the importance of Sherman's services and those of his wife to the corporation,[9] and it is also true that by reason of Sherman's guarantee of certain obligations of the corporation to third parties the corporation became indebted to him.[10] But we have concluded that these circumstances do not warrant departure from the general rule of separation of identities, nor afford Sherman standing to bring suit in his individual capacity as a shareholder or creditor on any of the claims asserted in this action, whether under the Dealers' Act,[11] the antitrust laws[12] or the pendent state claims.[13] The basis for the summary judgment against Sherman with reference to his Dealers' Act and fraud claims does not clearly appear from the record, but since related questions are akin to that of jurisdiction,[14] we notice them at the threshold.
 
 
 45
 Absence of liability on the part of Satori also clearly appears notwithstanding any view that may be taken as to liability of the other parties. As mentioned before, Satori was the Pasadena dealer who received a franchise for the full Leyland line upon the expiration of the Vincent franchise. There is no indication in the record that Satori was a manufacturer or agent of a manufacturer, or a party to the franchise in question, or that he conspired or combined with the other defendants in restraint of trade, in derogation of any contract rights of Vincent, or by fraud. Summary judgment of "no cause of action" as to Satori was clearly proper and is affirmed.
 
 
 46
 Nor was the dismissal of the action as to British Leyland error in any reasonable view of the record.[15] While this company actually was a manufacturer, it did not sign the franchise, nor insofar as the record discloses did it have anything to do with the franchise or any of the other contract documents, or with any alleged conspiracy in restraint of trade or any monopoly or attempt to monopolize. Any relationship of parent and subsidiary between it and others that may have done so is not enough. Marquis v. Chrysler Corp., 577 F.2d 624 (9th Cir. 1978), Supra.
 
 
 47
 To simplify the discussion that follows and for differentiating reasons which will become more apparent in its course, we proceed to consider liability on the part of BLM, LMS and BMCD, the remaining defendants, to whom we will intend to refer unless the context otherwise indicates when "appellees" or "defendants" are mentioned. In a similar effort we will designate the surviving plaintiff-appellant as "Vincent" or "plaintiff".
 
 II. ISSUES OF MATERIAL FACT
 A. DEALERS' ACT
 
 48
 The requisites of a sufficient claim under the Automobile Dealers' Day in Court Act are: (1) The plaintiff must be an "automobile dealer"; (2) defendant must be an "automobile manufacturer" engaged in commerce; (3) there must have existed a manufacturer-dealer relationship created by written franchise agreement, and (4) plaintiff must have been injured by the defendant's failure "to act in good faith in performing or complying with any of the terms or provisions of the franchise, or in terminating, canceling, or not renewing the franchise with said dealer." 15 U.S.C. § 1222 (1976). See also Stansifer v. Chrysler Motors Corp., 487 F.2d 59, 63 (9th Cir. 1973).[16]
 
 
 49
 While, as we have seen, Sherman individually was not an "automobile dealer" protected by the Act, Vincent clearly was such a dealer. Id. § 1221(c). It is unquestioned that BLM as well as LMS, its wholly-owned subsidiary, for purposes of this case should be deemed "automobile manufacturers" within the description of the Act. Id. § 1221(a).[17]
 
 
 50
 The situation of BMCD is different in several respects. It was not a subsidiary of any British Leyland company. It had no contractual relationship with British Leyland, nor did it ever assume to act for that manufacturer. Yet it did contract with one of the latter's "manufacturer" subsidiaries and acted in concert with, and in a sense for, both of them in carrying out the Rationalization Program. Whether BMCD thereby projected itself within the range of the term "manufacturer" and as such exposed itself to possible liability under the Dealers' Act, must be considered. We are confronted also with the related question of whether BMCD and BLM could be liable for violation of the Dealers' Act even though they were not signatories of the Vincent franchise.
 
 
 51
 In Stansifer v. Chrysler Motor Corp., 487 F.2d 59 (9th Cir. 1973), Supra, it was held that where there was no showing that a distributor had been the agent of the manufacturer in entering into contracts with the dealer or a "straw man" erected as an insulation against liability, the dealer had no cause of action against the manufacturer.[18] Marquis v. Chrysler Corp., 577 F.2d 624 (9th Cir. 1978), determined that while a subsidiary of a manufacturer was liable under the Dealers' Act, as a "statutory" manufacturer, the manufacturer, Chrysler Corporation, itself was not liable because it was not a party to the franchise agreement illegally terminated by the subsidiary.[19]
 
 
 52
 Both BMCD and BLM maintain that these decisions insulate them from liability on Vincent's Dealers' Act claim, notwithstanding any improper failure of LMS to renew the dealer's franchise, also denied. LMS furthermore seeks protection from liability in Stansifer because any refusal to renew its agreement with Vincent was by BMCD after LMS had ceased to be the distributor for southern California and because there was allegedly no showing of an agreement or agency between BMCD and LMS.[20] Vincent attempts to counter this argument with the contention that BMCD "signed" its own franchise agreement with Vincent by its letter of October 30, 1973.[21] This contention borders on the frivolous since Vincent refused to acknowledge the terms of the letter, claims that it was not bound by it and relied upon the franchise granted by LMS for the remainder of its term. Vincent's argument that BMCD was the "successor in interest" to LMS wholly by reason of considerations discussed in DeCantis v. Mid-Atlantic Toyota Distributors, 371 F.Supp. 1238 (E.D.Va.1974), in and of itself might be questioned in view of the rejection by that court of the application of the rule established by Stansifer.[22]
 
 
 53
 BMCD further argues that, despite the provisions of the contract between BLM and BMCD, neither BLM, LMS nor BMCD would renew or extend any dealer agreement then in force without the consent of the others, the evidence shows that BMCD ignored this provision and, in particular, that it acted unilaterally in its decision not to appoint Vincent for an additional term. There was at least conflicting evidence on this point aside from the inherent effect of the Rationalization Program. But in view of that effect it is plain that each entity, to the extent that it may have willfully combined with the others to carry out the terms of the program, acted for the others as well as itself in bringing about consequences which such program rendered inevitable. BLM without considering its involvement through the Rationalization Program, directs attention to the provision of the Dealer's Agreement executed by LMS and Vincent that it would not be considered a party.
 
 
 54
 It is contended by plaintiff that all of the appellees were committed to the effectuation of the Rationalization Program in violation both of the Dealers' Act and the antitrust laws and that they conspired to implement that plan by the elimination of Vincent as a dealer, particularly if he did not agree to the "tying arrangement" of a full-line dealership. That the existence of such a unified program with its alleged consequences could not have been properly ruled out by summary judgment has been indicated to us by an independent and thorough review of the record which was before the district court and by the expressed position of the appellants as reflected in their briefs on this appeal.
 
 
 55
 For example, the British Leyland appellees state that by the spring of 1972, BLM "was ready to tackle the consolidation of wholesale distribution through a single organization in each territory, either LMS or an independent distributor. . . . The overlap and duplication of distribution functions were eliminated by the appointment of a single distributor which would have responsibility for the wholesaling to retail dealers of all British Leyland vehicle lines in that territory." British Leyland's answering brief at 6. BMCD states: "Recognizing the economics involved, BMCD set about appointing only full-line retail dealers of British Leyland Products." BMCD's brief at 6. The British Leyland appellees, "(a)part from matters of emphasis and a (claimed) serious flaw in the discussion of the relevant product market, do not challenge appellants' Statement of Facts." On the contrary, on the point of the effect of the Rationalization Program upon Vincent, they state: "It is perfectly true, as plaintiff says, that the Rationalization Program ultimately caused plaintiff to lose its Triumph franchise when it expired in December, 1973." British Leyland appellees' answering brief at 4, 7.
 
 
 56
 When such additional circumstances are superimposed upon the reservation in the written franchise of the right on the part of the other appellees to veto BMCD's action in appointing dealers, the transfer to that distributor of LMS' distributor rights under the franchise prior to the expiration of Vincent's dealership, and the other indicia of control which were indicated in Stansifer and Marquis to be insufficient separately to establish agency, it is apparent that there exists a situation quite different in this case with respect to the problem of agency.
 
 
 57
 Recognition of the differentiating circumstances of the present case involves no departure from the principles of Stansifer and Marquis.[23]
 
 
 58
 Reasonableness of the Rationalization Program is a different question. Appellees contend that this program is entirely reasonable and legal both under the Dealers' Act and the antitrust laws. If this should be the ultimate determination, Vincent would have no valid claim against any of the appellees, with the possible exception of LMS under the Dealers' Act, and no claim whatsoever under the antitrust laws, since such claims are inextricably intertwined with the consequences of the Rationalization Program.
 
 
 59
 We have concluded, however, that there was a showing by plaintiff before the district court sufficient to withstand a summary determination that such Rationalization Program as applied to it did not constitute a violation of the antitrust laws. Particularly, we have found that there was a Prima facie showing before the district court of a section 1 conspiracy. For similar foundational reasons we believe that as to BLM and BMCD, as well as LMS, there was sufficient evidential indication to preclude summary judgment on the issue of whether such appellees were manufacturers who at this stage should be deemed parties to the franchise because the putative conspiracy supplied the element of agency. We are mindful that Stansifer rejected a claim of conspiracy in similar context, but this was upon the basis of insufficiency of the evidence to sustain that theory.[24]
 
 
 60
 The franchise with which we are concerned was the agreement signed by Vincent and LMS. It cannot be disputed that at the time of the takeover of the Triumph distributorship by BMCD, Vincent had a subsisting Triumph franchise from LMS. It is the failure to renew that franchise upon which liability to Vincent under the Act depends, whether that failure is ascribable to BLM, LMS, BMCD or all three.
 
 
 61
 Whether BMCD was the successor in interest to LMS as franchisor or BMCD was an entity otherwise subject anew to the obligation of good faith consideration of the renewal of the franchise, may be a matter of mere semantics. Such distinction in any event was rendered unimportant by the concerted action of BLM, LMS, and BMCD in applying to Vincent and its franchise the consequences of the Rationalization Program pursuant to the agreement among them. This coalescence of forces resulted in the nonrenewal of Vincent's Triumph franchise. Accordingly, and in view of the intendments favorable to the nonmovant at this stage, we reject as too much of a "heads we win, tails you lose" proposition, LMS' argument that there was no duty on its part to grant a renewal of Vincent's franchise because its distributorship had been terminated before the expiration of the franchise, and the argument of BMCD that it had no duty under the franchise because it had not signed any agreement.
 
 
 62
 It is unnecessary for us to determine in the abstract whether an independent distributor who takes over an existing franchise granted by another distributor as a matter of law is under all of the duties of the original franchisor with respect to any obligation of renewal by reason of presumed common "control" by the manufacturer,[25] or whether this would be consistent with Stansifer and Marquis. Here, where there is indication that any assumption by BMCD of obligations and rights under the unexpired franchise, and the refusal to renew the dealership, were the result of agreement among the importer, the old distributor and the new distributor, each for the purposes of the summary judgment should have been deemed a representative of the others with respect to such franchise and its nonrenewal.
 
 
 63
 Whether there was evidence as to any appellee that it failed to act in good faith[26] in complying with the franchise or in its nonrenewal, and whether there was coercive conduct against Vincent must next be considered.
 
 
 64
 A showing of coercion and intimidation which produces unfair or inequitable results is essential to a valid claim of lack of good faith under the Dealers' Act. Thus it is necessary to consider not only whether a manufacturer has brought pressure to bear on the dealer, but its reason for doing so, since what constitutes coercion and intimidation will depend upon the circumstances arising from each particular case. Autohaus Brugger at 911.
 
 
 65
 Vincent asserts that the defendants breached the duty of good faith in violation of the Dealers' Act in several ways: by making it clear to plaintiffs that, unless dealers "got together" by way of merger or buy out, BMCD would terminate many of the franchises; the pointing out by an employee of BLM and LMS to dealers that a buy out was one method of handling the problems occasioned by the Rationalization Program; threats of BLM, LMS and BMCD that the Triumph dealership would be terminated unless Vincent agreed to buy and sell the entire Leyland line; the drastic reduction of its allocation of cars after August, 1972; demands that the dealer claim no rights and view BMCD as having no obligations after BMCD took over Triumph distributorship in Pasadena with the threat of nonrenewal so conditioned; attempts of BMCD to coerce Vincent into acknowledging the absence of a written franchise with BMCD, and the attempted intimidation of plaintiffs into surrendering the Triumph franchise in exchange for an unprofitable "Jensen" franchise.
 
 
 66
 We have reviewed the record bearing upon these claims and have concluded that there is no supporting indication of bad faith, intimidation or coercion except possibly from their relationship to the Rationalization Program for full-line dealerships, which we now discuss.
 
 
 67
 The suggestion to Sherman that a merger or buy out of another dealer was one way to be able to handle the full line was neither coercive nor intimidating in and of itself.[27] Any misallocation of automobiles apparently did not involve any threat or coercion, express or implied, and Vincent's suggestion of a disproportionate allocation at all is not supported by the record.[28]
 
 
 68
 BMCD's letter of October 30, 1973, presented a proposed interim arrangement which on its face appears reasonable in the course of BMCD's undertaking to review all candidates for appointments as dealers in the southern California area. Vincent's interpretation of the letter as a demand that the dealer not claim any rights and not view BMCD as having any obligation to the dealer in and of itself seems insignificant, if not unwarranted.
 
 
 69
 But conversations of Sherman with officers of BMCD are interpretable as impliedly threatening Vincent with the loss of the dealership unless he consented to full-line representation. Implicit in the entire relationship of the parties after the intervention of BMCD was that if Vincent would not undertake a full-line dealership, which he ultimately declined to do, his distributorship would not be renewed. A wrongful demand can be implicit, inferable from facts and circumstances without any showing of a formal one. Marquis at 634.
 
 
 70
 Under various circumstances a manufacturer's insistence that a dealer carry a full line of products may be proper.[29] On the other hand, there is authority that this type of insistence may constitute a wrongful and coercive demand.[30] A differentiation or reconciliation of these cases is unnecessary here, since we are convinced in view of the basic principles espoused by both lines that this was not a case properly subject to resolution on summary judgment.
 
 
 71
 There is indication on the record that the pervasive policy and program of BLM, LMS and BMCD was to divide geographical markets between the latter two distributors and to eliminate such dealers as Vincent in all markets, notwithstanding the latter's previously successful operation of the existing franchise, unless it consented to full-line representation of British Leyland products. There was also a clear showing that following at least implied threats to this effect, Vincent's franchise was not renewed as the proximate result of its refusal to accept such full-line representation. Whether any related intimidations, pressures, threats and resistance which resulted in he nonrenewal of Vincent's franchise constituted a reasonable response to economic problems confronting the manufacturer, as appellees contend, or were unreasonable, unfair and unlawful conduct on their part, as Vincent asserts, should not have been resolved on summary judgment.
 
 
 72
 The presence or absence of business justification or necessity for the Rationalization Program, of course, is pertinent to this view but can better be explored with reference to plaintiff's antitrust claims. If, as we have concluded, there are issues precluding summary judgment that the application of that program to Vincent was lawful under the Antitrust Act, it seems clear that there would be a corresponding issue on this record under the Dealers' Act.[31] We cannot conceive that any unreasonable restraint of trade in violation of the antitrust laws could be upheld on the present record as a reasonable, fair or equitable basis for the nonrenewal of Vincent's franchise within the provisions of the Dealers' Act. We turn, then, to the antitrust issues.
 
 
 73
 B. SECTION 1 OF THE SHERMAN ACT AND SECTION 3 OF THE CLAYTON ACT
 
 
 74
 In reviewing dismissal of the antitrust claims, we must be mindful of the especially strict requirements of Rule 56 in this field,[32] while recognizing that there are circumstances which authorize, indeed require, summary disposition.[33]
 
 
 75
 Vincent's position with respect to its section 1 claims is that the established purpose and effect of the Rationalization Program was to reduce competition among distributors as well as dealers; that pursuant to such program, and as a result of a conspiracy for its establishment and effectuation among appellees, BLM (as importer) and LMS and BMCD (as distributors) formed a combination to divide geographically the market for British Leyland cars between formerly competing distributors and that BMCD, accordingly, became the only Leyland distributor in the area in which Vincent operated a dealership, the number of British Leyland dealers was reduced, Vincent's Triumph dealership was terminated and it was driven out of business. These results, says Vincent, were achieved among other means by both a horizontal and vertical division of markets geographically, a group boycott or concerted refusal to deal, and by a tying violation of both section 1 of the Sherman Act and section 3 of the Clayton Act.
 
 
 76
 Appellees argue that their actions did not violate the antitrust laws because the Rationalization Program was a reasonable, if not the only possible, response to an economic plight in which the British Leyland companies found themselves in the early 1970's, and the BLM-BMCD agreement did not provide for exclusive geographic territories. Rather it gave BMCD a new development area which appellees characterize as akin to that of "primary responsibility", discussed in GTE Sylvania, Inc. v. Continental T.V., Inc., 537 F.2d 980, 995, n.25 (9th Cir. 1976), Aff'd, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).
 
 
 77
 The British Leyland appellees refer to the LMS-BMCD exchange as "a vertically integrated manufacturer appoint(ing) one distributor (its own subsidiary) to sell its products in one area at the same time it appoints an independent company to sell the same lines in some other area." It is urged that such action is not unlawful in view of principles discussed in such cases as Knutson v. Daily Review, Inc., 548 F.2d 795 (9th Cir. 1976); Dental Supply Co. v. Cavitron Corp., 461 F.2d 1093 (3d Cir. 1972); Mutual Fund Investors, Inc. v. Putnam Management Co., 553 F.2d 620 (9th Cir. 1977). Appellees say that there was no horizontal division of markets. They admit, but overlook the significance of the fact, that before the agreement for division of the northern and southern California markets BMCD and LMS regarded themselves as competitors selling different but competing automobiles.[34] The appellees further argue that there is no support in the record for the claim that the exchange of distribution rights between BMCD and LMS affected competition in southern California to appellants' detriment.
 
 
 78
 Whether there was evidence tending to show a horizontal division of markets among competitors depends primarily upon the agreement between BLM and BMCD[35] which provides in part:
 
 
 79
 B. BLM is desirous of consolidating the distribution of its various lines through a single distribution channel, and has arranged to terminate the distribution of Jaguar in an area generally corresponding to (BMCD's current southern California area). BLM is prepared to add Jaguar, Triumph and Land Rover to (BCMD's Austin/MG distribution . . . within (BMCD's southern California area).
 
 
 80
 C. In exchange therefor . . . (BMCD) is willing to surrender its distribution rights under the Northern Agreement, together with any claim it may have for the renewal of such agreement, to BLM in order that BLM may through its subsidiary . . . (LMS), add distribution of Austin, MG and Jaguar to its existing Triumph and Land Rover distribution.
 
 
 81
 LMS thereby became the franchise distributor of all British Leyland automobiles in northern California, giving up its Triumph, Rover and Land Rover distribution rights in southern California. BMCD became the southern California distributor of all Leyland cars in exchange for its rights to distribute Austin and MG in northern California. This in effect suggested an agreement between BMCD, as a competitor of LMS, and LMS to eliminate competition between them on the wholesale distribution level. There was proof before the court tending to show that MG and Triumph automobiles were in direct competition. More was involved than unilateral designation by a manufacturer of "areas of primary responsibility" in which a distributor was to operate. A jury could infer from the evidence that, despite the "area of primary responsibility" label, the defendants agreed to divide markets geographically. All of the other elements of resulting section 1 violations appeared sufficiently to withstand summary judgment. United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); White Motor Co. v. United States, 372 U.S. 253, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963).
 
 
 82
 If there were only a vertical geographic division of markets not a Per se rule, but "the rule of reason" would generally apply.[36] We address this and other alternative theories since we have not been asked, nor are we prepared, to rule as a matter of law in support of plaintiff's horizontal conspiracy theory. Only upon fully-developed facts will this case lend itself to nicely definitive treatment.
 
 
 83
 In determining whether a restraint is unreasonable, the primary considerations are whether the intent of the restraint is anticompetitive and whether the restraint itself has significant anticompetitive effects. "Under this rule, the factfinder weighs all of the circumstances of the case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." Continental T.V., 433 U.S. at 49, 97 S.Ct. at 2557.
 
 
 84
 Appellees answer the charge of a vertical conspiracy in restraint of trade as they did the horizontal conspiracy claim and especially emphasize that the BMCD-BLM agreement provided merely for "areas of primary responsibility" rather than any exclusive dealerships. In this view they contend that any restraint was reasonable and that no legal injury was caused either to Vincent or competition within any relevant market. Reasons for rejecting the arguments as to a horizontal conspiracy apply generally to the claim of vertical conspiracy,[37] but the element of reasonableness warrants further comment.
 
 
 85
 It has been held in cases involving the defense of primary responsibility clauses in vertical situations that even if genuine agreements calling for areas of primary responsibility may be valid, where a primary area of responsibility is used to mask the application of an illegal territorial restriction, illegality will nevertheless be found. Reed Bros., Inc. v. Monsanto Co., 525 F.2d 486 (8th Cir. 1975), Cert. denied, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 645 (1976); Hobart Bros. Co. v. Gilliland, Inc., 471 F.2d 894 (5th Cir.), Cert. denied, 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973). The primary responsibility label did not immunize the arrangements among the appellees here from fact finding examination under the rule of reason.
 
 
 86
 Plaintiff had to demonstrate genuine issues of material fact not only with respect to the causal connection between its injury and defendants' actions, rather clearly appearing here, but also that its injury was of the type the antitrust laws were intended to prevent, that is, that defendants' conduct did have some anticompetitive effect beyond plaintiff's own loss of business or the market's loss of a competitor. Knutson v. Daily Review, Inc., 548 F.2d 795, 803 (9th Cir. 1976), Cert. denied, 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977).[38]
 
 
 87
 We have concluded that the record sufficiently tended to support these essential elements also with reference to a relevant product and geographic market of imported sports cars with retail value of between $3,000 and $5,500 in the San Gabriel Valley.[39]
 
 
 88
 Defendants regarded as being included in plaintiff's burden the production of "data and other material necessary to measure the degree of 'functional interchangeability' between the products involved as to price, use, quality and characteristics." Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1218 (9th Cir. 1977). Plaintiff denies that it had fair opportunity to develop the record in this respect, but we believe it is sufficient for present purposes.[40] Professor Aaker's statement inferentially took into consideration the problem of interchangeability in supporting plaintiff's definition of the relevant market and evaluating anticompetitive effects of the Rationalization Program. Plaintiff's showing as to impact on competition was far from complete or even satisfactory. Yet counterpoints sought to be made by appellees were directed primarily to a geographic and product market differently defined.
 
 
 89
 Without unduly fragmenting our consideration, and viewing the present record as a whole,[41] we do not rule out the existence of genuine issues of material fact with respect to a possible vertical conspiracy in restraint of trade and its anticompetitive effect upon the relevant market.[42] A paraphrasing of a portion of the opinion in Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc., 585 F.2d 821, 831 (7th Cir. 1978), Cert. denied, --- U.S. ----, 99 S.Ct. 1267, 59 L.Ed.2d 486 (1979), provides a summarization of our conclusions on the foregoing phrase of the section 1 claim:
 
 
 90
 A horizontal agreement among potential competitors . . . not to compete with each other . . . is, we think, considerably more suspect than limitations imposed by a single independent manufacturer on its distributors as a condition of their distributorship, but even if we were inclined to agree with (the) . . . argument to the contrary and . . . that the Rule of Reason could be applied, we would be unable to agree that (Vincent) failed to (establish genuine issues of material fact) under that rule.
 
 
 91
 This case does not readily lend itself to a group boycott analysis with Per se consequences. As we have seen, the indication of any failure to fairly allocate automobiles to Vincent was insufficient to comprise a basis for the Dealers' Act claim, much less for any boycott claim. Yet with respect to the application of the Rationalization Program to preclude Vincent's access to the Triumph market as a part of a horizontal combination or conspiracy, further proceedings on that theory should not be ruled out.[43]
 
 
 92
 Vincent's present reliance upon section 3 of the Clayton Act[44] derives not from circumstances the Clayton Act directly applies to, but the tying consequences of the alleged conspiracy. Thus, in answer to an interrogatory propounded to it by the British Leyland defendants, plaintiff in the district court asserted that "there was an implied understanding that defendants refused to sell Triumph products to plaintiff except on the condition that plaintiffs would not purchase the products of defendants' competitors (and) this understanding was implied in all the circumstances surrounding the franchise. . . ." Other than for corresponding allegations in the complaint and this assertion, there can be found nothing in the record to justify such an invocation of the Clayton Act. This does not, however, preclude the possibility of a tying claim within the expanded meaning of Clayton Act § 3 in the light of section 1 of the Sherman Act.
 
 
 93
 The principles applicable to such a claim have so recently been discussed in detail as to make unnecessary any exposition of the law of tie-ins here. Moore v. Jas. H. Matthews & Co., 550 F.2d 1207, 1211-18 (9th Cir. 1977). See also Bogosian v. Gulf Oil Corp., 561 F.2d 434 (3rd Cir. 1977), Cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). Despite a contrary holding with regard to the same "rationalization program" in David R. McGeorge Car Co. v. Leyland Motor Sales, Inc., 504 F.2d 52 (4th Cir. 1974), Cert. denied, 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975),[45] we are inclined to the opinion that enough has been shown of record here to have justified further proceedings beyond summary judgment on a tying theory.
 
 
 94
 When a franchisor conditions the sale of a franchise on the buyer's agreement to buy additional products from the franchisor, the law of tying may come into play with its Per se consequences upon a demonstration by the claimant of requisite economic power and not an insubstantial effect upon commerce. Kentucky Fried Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368 (5th Cir. 1977). As we have seen, there is some indication in the record of a substantial effect upon commerce in a relevant market of the application of the Rationalization Program to Vincent because he would not accept the full British Leyland line. The economic power over Triumph automobiles, parts and accessories, the tying products, in the relevant market, and the combined market share of appellees with the consolidation in the market of MG's and Triumphs, estimated by Professor Aaker at 59%, as a result of the Rationalization Program are not adequately countered by appellees to foreclose this element on the present record.
 
 C. SECTION 2 OF THE SHERMAN ACT
 
 95
 Support in the record for a section 1 claim does not, of course, necessarily indicate existence of a section 2 claim, United States v. Griffith, 334 U.S. 100, 106, 68 S.Ct. 941, 92 L.Ed. 1236 (1948); Moore v. Jas. H. Matthews & Co., 473 F.2d 328, 332 (9th Cir. 1973). But the record as to each claim has much in common here. Vincent's section 2 contentions are in substance that appellees monopolized[46] the relevant market and attempted[47] and conspired[48] to monopolize this market, and that the district court erred in granting summary judgment when there remained genuine issues of material fact which if resolved in Vincent's favor would have supported findings of a section 2 violation. We believe that identification of the relevant market, market shares and monopoly power, specific intent, predatory conduct, dangerous probability of success, and antitrust injury are sufficiently suggested in the record to warrant their further exploration and analysis under section 2 in the light of consideration relating more particularly to section 1.[49]
 
 
 96
 Except for the suggestions in the margin of relationships between the various section 2 claims and the indication of a section 1 conspiracy between competitors which we have already pointed out in some detail, we believe it to be both unnecessary and inappropriate for us now to launch into a full-scale review of the cases from this circuit expounding the law of monopoly and its application to various related states of facts, none of which seems sufficiently close in point to be controlling. The guiding principles have been well defined by a considerable body of law in this circuit, yet the leading cases of Greyhound Computer Corp., Moore and Continental T.V. demonstrate how difficult it is with situations of novelty and conflicting bases of economic justification to select from variant legal principles those that should control in a given case and determine in view of that selection at which point the permissible blurs into the forbidden zone. Here, the facts bearing upon the monopoly claims have been only vaguely and quite imperfectly developed. Indeed, if those claims stood alone it would be doubtful that enough has been shown to indicate error in the summary termination of them. Perhaps that very doubt should be enough to preclude summary judgment, in view of notable lack of countervailing economic data from the appellees, who after all have the ultimate burden of justifying summary judgment. It is no answer to say that appellees' practices are honestly commercial rather than predatory for if a jury could properly conclude that they possessed monopoly power in the relevant market they would be precluded from employing otherwise lawful practices that unnecessarily excluded competition in the market. If there is yet to be presented by plaintiff in this case a sufficient showing to demonstrate the possession of monopoly power in the market, neither has there been a showing by appellees to the contrary.
 
 
 97
 While the admonition of the Supreme Court against the compartmentalization of proof found in Continental Ore, supra note 41, at 31, was in the context of a single theory, that of conspiracy, the principle applies also to section 2 claims as they may relate to, and in significant measure may depend upon, a possible conspiratorial framework involving competitors.
 
 
 98
 Without further analyzing the fragmentary and unsatisfactory economic data thus far presented or risking a crystalization of legal applications with respect thereto with the possibility of limiting the trial court's explorations, the case should be remanded as to all Sherman Act, as well as to the Dealers' Act, claims.
 
 D. PLAINTIFF'S PENDENT CLAIMS
 
 99
 Since Vincent's federal claims continue viable, we are not called upon to determine whether there would have been justification for the trial court's entertaining the state claims on their merits notwithstanding dismissal of the federal claims. See United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).
 
 
 100
 Plaintiffs assert that two contracts were breached: the written franchise with LMS, of which BMCD was a "successor-in-interest" as argued by Vincent, and an oral agreement between Vincent, BLM, LMS and BMCD "which was reduced to writing". The oral promise "reduced to writing" upon which plaintiffs rely, is the statement made by M. H. Dale, Vice-President of BLM at the Triumph National Dealer Council Meeting June 6, 1972, as later reflected in the written minutes of the council, that "we see no reason why a good dealer's franchise should not continue whoever the distributor might be."
 
 
 101
 Regarding the written contract, plaintiff contends that language in the franchise with respect to automatic termination did not foreclose recovery for breach of contract.[50] We have held, indeed, that the Dealers' Act claim was not thereby defeated. And we are prepared to accept the contention that the provisions quoted in the margin would not relieve the franchisor and those acting under it from the consequences of any antecedent breach of the contract under state law. No breach as such, however, is indicated by the record except to the extent that a violation of the Dealers' Act Per se would accomplish it.
 
 
 102
 Plaintiff argues that at least LMS' contract with Vincent was breached at the time of the LMS-BMCD exchange. On the contrary, the exchange as such does not appear to have affected that contract, being in recognition of it as we have already observed. The claim of interference with prospective business advantage also must fail, unless violation by any of the appellees of either the Dealers' Act or the antitrust laws established such a claim Ipso facto, given a contract presupposing good faith compliance.
 
 
 103
 Nor can we agree that the statements of Dale, an employee of BLM and LMS, concerning the renewal of a "good dealer's" franchise was a misrepresentation meeting the classic tests of a fraud claim.[51] If we assume that there is indication on the record that the representation was one of present intention that might furnish the foundation, if false, of a claim for fraud,[52] there yet is no indication that, considered in context, it was false or incompatible with good faith belief when made.[53]
 
 
 104
 Plaintiff's primary state law contention, as we understand it, is that the contract between Vincent and LMS had as an implied condition the undertaking of good faith and fair dealing on the part of the franchisor. There is an implied covenant, it is argued, that neither party would do anything to deprive the other of the benefits of the contract, and to do everything that the contract presupposed would be done to accomplish its purposes and benefits. The same implied condition, says Vincent, would require good faith in the renewal of the franchise. Clearly nonrenewal in bad faith and in violation of the Sherman Act and the Dealers' Act, Vincent argues, breached the implied covenant of good faith.
 
 
 105
 It is manifest that aside from the Dealers' Act and federal antitrust laws no breach of contract or deprivation of contract rights under state law has been shown. We have difficulty in perceiving how the Automobile Dealers' Act and the federal antitrust laws could be deemed so assimilated by state law as to become independent bases for state contract claims with seeming vesting in state courts of the jurisdiction which the federal statutes grant exclusively to the federal courts.
 
 
 106
 This is not to say, however, that some circumstances constituting violation of the Dealers' Act or federal antitrust laws may not also support pendent contract claims, depending upon state law applications. But we have been left largely in the dark concerning the California authorities bearing upon breaches of implied covenants of good faith and fair dealing. The district court gave no reason for dismissing the pendent claims, and the parties' briefs make little or no argument on the subject other than to cite to their memoranda below which in appellees' case are not even a part of the designated record. And we have no argument at all before us on how state law meshes with federal law in this area. This record, to say the least, is not satisfactory for definitive treatment here.
 
 
 107
 Since the federal claims must be tried, and the state claim for alleged breach of the implied covenant relied upon by plaintiff in any event will involve little, if any, additional evidence, we remand that claim also for an explicit determination by the district court of its validity and merit in the light of California law.
 
 III. DISCOVERY COSTS
 
 108
 As to the cross-appeal, we find no abuse of discretion on the part of the district court in refusing to tax against plaintiffs the costs that cross-appellants incurred in making copies of depositions and defense counsel's travel and sustenance expense in connection with depositions. The statute does not specifically address this problem, but defendants construe together the two sections touching upon it[54] as authorizing the award of the additional costs claimed. If this were to be assumed, the requested award still would be discretionary. In view of the determined invalidity of summary judgment on the principal issues of the case, however, the particular point has become moot for the present. Further consideration no doubt will be given by the district court to this and related questions in the new context in which they finally will be presented.
 
 
 109
 We have intended to express no view of the merits upon trial.
 
 
 110
 AFFIRMED as to the dismissal of all claims against Sherman and Satori and the pendent state claims against all defendants except for alleged breach of an implied covenant of good faith and fair dealing; otherwise REVERSED and REMANDED for further proceedings not inconsistent with this opinion.
 
 
 
 *
 The Honorable A. Sherman Christensen, Senior United States District Judge for the District of Utah, sitting by designation
 
 
 [1]
 Also known as the Automobile Franchise Act, 15 U.S.C. §§ 1221-1225 (1976). For convenience this Act usually will be referred to hereinafter as the "Dealers' Act"
 
 
 [2]
 Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2 (1976); § 3 of the Clayton Act, 15 U.S.C. § 14 (1976)
 
 
 [3]
 Pendent state claims for breach of contract, interference with prospective business advantage and fraud
 
 
 [4]
 Fed.R.Civ.P. 56
 
 
 [5]
 BRITISH LEYLAND MOTOR CORPORATION, LTD. (hereinafter referred to as British Leyland) a defendant-appellee, in 1968 became the top company of the British Leyland group as the result of the merger of British Motor Corporation, manufacturer of Austin, MG and Jaguar, and Leyland Motor Corporation, manufacturer of Triumph, Rover and Land Rover. As a result of this merger, British Leyland became the parent of three separate U.S. marketing organizations: British Motor Holdings (U.S.A.), Inc., which marketed MG; Leyland Motor Corporation of North America, the importer of Triumph (and Rover at that time), and Jaguar Cars, Inc., importer of Jaguar. These three U.S. companies were consolidated into British Leyland Motors, Inc. (BLM), on October 1, 1968, which continued to operate through three divisions up to 1972: Jaguar, Triumph-Rover and Austin-MG
 BRITISH LEYLAND MOTORS, INC. (BLM), a Delaware corporation, a defendant-appellee, is the wholly-owned subsidiary of British Leyland, being the October 1, 1968, consolidation of the three U.S. companies as mentioned above. BLM as the United States importer resells British Leyland products to its wholly-owned subsidiary, Leyland Motor Sales, Inc. (LMS), or to independent distributors such as British Motor Car Distributors, Ltd. (BMCD).
 BRITISH MOTOR CAR DISTRIBUTORS, LTD. (BMCD), another defendant-appellee, is a wholly-owned subsidiary of Jensen International Motors Corp. and its ownership is independent of the other defendants-appellees. BMCD is a distributor of passenger cars, parts and accessories manufactured by British Leyland and imported by BLM.
 LEYLAND MOTOR SALES, INC. (LMS), another defendant-appellee, is a wholly-owned subsidiary of defendant-appellee BLM. LMS is a distributor of passenger cars, parts and accessories manufactured by British Leyland and imported by BLM. Plaintiff-appellant Vincent's franchise agreement involved here was signed with LMS for an additional one-year period expiring December 2, 1973.
 Peter SATORI Company, Inc. (Satori), a defendant-appellee, was a long-established retailer of imported cars in Pasadena, California, where Vincent did business. Satori bought Jaguars from one independent distributor in Los Angeles, and MG and Austins from another distributor in Compton, California. It was appointed a full-line British Leyland dealer in Pasadena when Vincent lost its Triumph franchise in the same city in 1972 in connection with BLM's consolidation of its wholesale distribution system pursuant to a "Rationalization Program".
 Gary H. SHERMAN, plaintiff-appellant, was the president and sole shareholder of the other plaintiff-appellant, Vincent Imports, Inc., dba European Motors, which conducted business as a retail automobile dealership in Pasadena, California, from December 1, 1971, until March 15, 1974.
 VINCENT IMPORTS, INC. (Vincent), dba European Motors, one of the plaintiffs-appellants, conducted business as a retail automobile dealer in Pasadena, California, from December 1, 1971, until March 15, 1974. Sherman became the president and sole shareholder of Vincent on December 1, 1971, and continued as such during all relevant times. Vincent previously had been a Triumph dealer, and under Sherman was given a one-year Triumph franchise by LMS. The franchise was renewed by LMS on December 2, 1972, for an additional one-year period.
 
 
 [6]
 Gary W. Whitehead, president of both BLM and LMS, conceived the Rationalization Program, perhaps as early as 1968. He, together with Michael H. Dale, a vice-president of BLM and also LMS, participated in the implementation of the program
 
 
 [7]
 The text of this agreement apparently was not made part of the record on appeal but appears in the brief of appellees at 90-97. It, however, is referred to on the record in the "Distribution Agreement" as "Exhibit A"
 
 
 [8]
 "It is perfectly true, as plaintiff says, that the Rationalization Program ultimately caused plaintiff to lose its Triumph franchise when it expired in December 1973." Leyland appellees' answering brief at 7
 
 
 [9]
 Paragraph 16(c)(1) of the franchise agreement provided, among other things, that the "death, incapacity, removal, resignation, or withdrawal from active participation with the dealer for any reason of any of the persons listed on the Schedule as principals of the Dealership" would give the distributor cause to terminate the agreement. The schedule listed "Gary Harold Sherman President" and "Helga Sherman Vice President". But the franchise in paragraph 16(g) provided also "that either party may in its full discretion and with or without any cause cancel this Agreement upon not less than thirty days notice to the other."
 
 
 [10]
 Sherman alleged by affidavit:
 My salary income and fringe benefits of approximately $36,000 per year ended with the loss of the Triumph franchise and in addition I was required to repay loans on behalf of the corporation by reason of my personal guarantee. In early 1974, I repaid $70,000 to banks as such guarantees. Of this amount, some $11,000 has been repaid to me by the corporation, leaving a balance owing to me, by the corporation, of approximately $59,000 which the corporation is wholly unable to pay.
 
 
 [11]
 Vincel v. White Motor Corp., 521 F.2d 1113 (2d Cir. 1975); Lewis v. Chrysler Motor Corp., 456 F.2d 605 (8th Cir. 1972); Milburn v. Ford Motor Co., 437 F.Supp. 7 (E.D.Okl.1977); Rodrgue v. Chrysler Corp., 421 F.Supp. 903 (E.D.La.1976); Cf. Kavanaugh v. Ford Motor Co., 353 F.2d 710 (7th Cir. 1965); Judice's Sunshine Pontiac, Inc. v. Gen. Motor Corp., 418 F.Supp. 1212 (D.N.J.1976); Rea v. Ford Motor Co., 355 F.Supp. 842 (W.D.Pa.1972), Vacated on other grounds, 497 F.2d 577 (3d Cir.), Cert. denied, 419 U.S. 868, 95 S.Ct. 126, 42 L.Ed.2d 106 (1974), On remand, 406 F.Supp. 271 (W.D.Pa.1975); and Klebanow v. N. Y. Produce Exch., 344 F.2d 294 (2d Cir. 1965); (where seemingly contrary results were reached, but on distinguishable facts, involving corporate or partnership disinterest or inability in prosecuting claims to the detriment of beneficial owners or ambiguous records). York Chrysler-Plymouth, Inc. v. Chrysler Credit Corp., 447 F.2d 786 (5th Cir. 1971), is more nearly in point with reference to the Dealers' Act claims, but we are not persuaded to follow it. The provision involved in that case, and this, that if certain stockholders did not continue as principals in the business the dealership could be terminated by the franchisor, was for the benefit of the latter only and did not expand the parties to the agreement, as we view it
 
 
 [12]
 15 U.S.C. § 15 (1976). Walker Distrib. Co. v. Lucky Lager Brewing Co., 323 F.2d 1 (9th Cir. 1963), Cert. denied, 385 U.S. 976, 87 S.Ct. 507, 17 L.Ed.2d 438 (1966); See generally the leading case of Karseal Corp. v. Richfield Oil Corp., 221 F.2d 358 (9th Cir. 1955). Cf. Perkins v. Standard Oil Co., 395 U.S. 642, 649, 89 S.Ct. 1871, 23 L.Ed.2d 599 (1969); Dailey v. Quality School Plan, Inc., 380 F.2d 484 (5th Cir. 1967); Hoopes v. Union Oil Co., 374 F.2d 480 (9th Cir. 1967); Nichols v. Spencer Int'l Press, Inc., 371 F.2d 332 (7th Cir. 1967) (distinguishable from the present case where the business and property were that of the corporation and the claims asserted were derivative). As stated in Bravman v. Bassett Furn. Indus., Inc., 552 F.2d 90, 97 (3d Cir.), Cert. denied, 434 U.S. 823, 98 S.Ct. 69, 54 L.Ed.2d 80 (1977): "These stockholders and creditor cases do not bear on Bravman's case (involving direct restraints upon his independent sales activities) for in all of them the alleged impact of a restraint of trade was felt in the business or property of a corporation, and the injury, if any, to the plaintiffs consisted only in the diminution of the value of the injured corporation." But see Data Digests, Inc. v. Standard & Poor's Corp., 43 F.R.D. 386 (S.D.N.Y.1967) (where unlike the present case the plaintiff officer of the corporation who was left in the case beyond a motion to dismiss on the pleadings had not had an opportunity to develop any record of his interest). We do not believe that Reiter v. Sonotone Corp., --- U.S. ----, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979), raises any question concerning our conclusion, dealing as that case does with direct damage to consumers rather than indirect losses suffered by corporate stockholders or creditors from the impact of antitrust law violations upon the corporation
 
 
 [13]
 Sherman lacks standing in his individual capacity to bring any of the pendent claims. Where there is an injury to the corporation, the cause of action should be brought by the corporation, or by the shareholders derivatively if the corporation fails to act; only for separate individual damage does an individual cause of action lie. Jones v. H. F. Ahmanson & Co., 1 Cal.3d 93, 81 Cal.Rptr. 592, 460 P.2d 464 (1969); Sutter v. General Petroleum Corp., 28 Cal.2d 525, 530, 170 P.2d 898, 901 (1946). Sherman lacked standing as a third party beneficiary, since his status was that of an incidental beneficiary. Where there was no direct undertaking or intention to benefit him, he had no rights under such a contract. Restatement of Contracts §§ 133, 147; Martinez v. Sacoma Cos., 11 Cal.3d 394, 113 Cal.Rptr. 585, 521 P.2d 841 (1974)
 
 
 [14]
 See Wright, Miller & Cooper, Federal Practice and Procedure § 3531 (1975). The trial court, although dismissing his antitrust and pendent claims for lack of standing, did not expressly deny Sherman's standing to individually maintain the Dealers' Act and pendent fraud claims. Without including the point in their cross-appeal, defendants argue that Sherman had no standing with respect to the latter claims also. Finally, the district court's dismissal of all claims as to all parties contained no explanation of reasons
 
 
 [15]
 While the answer of British Leyland was not made part of the record on appeal, memoranda before the district court indicate that its answer raised an issue of the In personam jurisdiction of the district court over it. Such issue remained unresolved when summary judgment was granted in its favor apparently on other grounds
 
 
 [16]
 Reference to the franchise agreement in this formulation departs from the not infrequent statements that there must be a written franchise agreement between the plaintiff and the defendant or between the manufacturer and the dealer. The latter statements would be unduly restrictive in view of the agency-conspiracy concept hereafter discussed
 
 
 [17]
 British Leyland Motor Corporation Limited, the English company . . . was, concededly, "the manufacturer" of Triumph cars in the 1971-1973 period. Its subsidiary, BLM, and the latter's subsidiary, LMS, are conceded to be each a "manufacturer" under the Dealer Act, although the Act also requires that there be a written contract between the manufacturer and the dealer, and there was no such contract between BLM and plaintiff
 Supplemental trial memorandum of the British Leyland defendants at R. 00534.
 
 
 [18]
 Stansifer at 66. Referring to provisions of the distributorship agreement some of which were similar to those with which we are concerned, including the provisions for a veto of the distributor's appointment of dealers, the court had observed: "Contractual provisions of the type here involved are not uncommon. In construing similar contracts the courts have held consistently that controls of the kind reserved by Chrysler do not create a relationship of agency, but rather one of buyer and seller." Id. at 65
 
 
 [19]
 Typical of supporting cases cited in Marquis is York Chrysler-Plymouth v. Chrysler Credit Corp., 447 F.2d 786 (5th Cir. 1971), in which the court stated: "(T)here being no showing that would make either responsible for the acts of the other on an agency theory, and the facts indicating that they are separate legal entities each operating in its own sphere, only the one who has entered into a franchise agreement could be held accountable for performing or complying with it." 447 F.2d at 791
 
 
 [20]
 See Stansifer, 487 F.2d at 66, Supra. However, for reasons hereafter discussed the problem in this case is essentially different than that in Stansifer
 
 
 [21]
 BMCD's letter . . . constitutes BMCD's version of its contractual relationship with plaintiffs between October 1 and December 15, 1973. The letter refers to an enclosed Dealer Agreement and says that BMCD will assume its terms are acceptable unless the dealer otherwise indicates. The letter and enclosure constitute a "franchise" within the meaning of the statute, and one which could not be terminated or nonrenewed by means of coercion or intimidation (the enclosure to the letter does not appear as part of the record before us)
 Vincent brief at 40.
 
 
 [22]
 The approach taken in Stansifer v. Chrysler Motors Corp., supra, in this court's view, misconceive(d) the nature of the remedy provided under the Automobile Dealers' Act, and, if followed, would effectively remove from the Act's protection all situations involving midstream changes in channels of wholesale distribution. This is a result which this court does not conceive as having been intended
 DeCantis v. Mid-Atlantic Toyota Distributors, 371 F.Supp. at 1243.
 
 
 [23]
 "A manufacturer may be liable notwithstanding it is not a party to the franchise if the party contracting with the dealer is the manufacturer's agent or merely a 'straw man' erected to insulate it from statutory liability." Marquis at 630
 The term "franchise" is defined in 15 U.S.C. § 1221(b) as "the written agreement or contract between any automobile manufacturer engaged in commerce and any automobile dealer which purports to fix the legal rights and liabilities of the parties to such agreement or contract." It is clear that without a written franchise there can be no claim or cause of action under the Act.
 There was no written agreement between Chrysler and Stansifer. The written agreements were between Chrysler as manufacturer and Fisher as distributor and between Fisher as distributor and Stansifer as dealer. Nor is there any evidence that Chrysler had any direct dealings with Stansifer prior to the termination of the dealer agreement between Fisher and Stansifer.
 Stansifer at 63-64.
 
 
 [24]
 From an examination of the entire record we find no evidence to support appellant's contention that Chrysler was acting as Fisher's agent (with respect to alleged coercion by employees of Chrysler after termination of the franchise in question by Fisher)
 Appellant also alleged in his complaint that appellees "conspired to wrongfully terminate plaintiff's non-exclusive dealership." No proof was offered to support this claim. . . .
 487 F.2d at 66.
 
 
 [25]
 See DeCantis v. Mid-Atlantic Toyota Distributors, 371 F.Supp. 1238, 1242 (E.D.Va.1974). See also Volkswagen Interamericana, S. A. v. Rohlsen, 360 F.2d 437, 441 (1st Cir. 1966); Barney Motor Sales v. Cal Sales, Inc., 178 F.Supp. 172, 175 (S.D.Cal.1959)
 
 
 [26]
 In view of the restrictive definition of "good faith" contained in § 1221(e) of the Act, this court has said:
 There is no question that the failure to exercise good faith within the meaning of the Act has a limited and restricted meaning. It is not to be construed liberally. . . . It does not mean "good faith" in a hazy or general way, nor does it mean unfairness. The existence or non-existence of "good faith" must be determined in the context of actual or threatened coercion or intimidation (citations omitted).
 In order to lack good faith the manufacturer's actions must be unfair and inequitable in addition to being for the purpose of coercion and intimidation (citations omitted).
 Autohaus Brugger, Inc. v. Saab Motors, Inc., 567 F.2d 901, 911 (9th Cir.), Cert. denied, 436 U.S. 946, 98 S.Ct. 2848, 56 L.Ed.2d 787 (1978).
 
 
 [27]
 Vincent claims coercion because of the suggestion of the president of BMCD and the vice-president of BLM and LMS that a merger or buy out of another dealer would be one way for the dealer to handle the full line. Sherman testified that he approached Satori about merger and was rejected, and that the matter ended there. It is straining to contend that Sherman's subjective feeling of coercion from the suggestion mentioned satisfied this element of a claim under the statute. Not the suggestion of merger but the unsatisfied insistence upon full-line representation was the cause of Vincent's rejection as a dealer
 
 
 [28]
 Misallocation of cars by itself without any threat of sanctions is not actionable under the Dealers' Act. See Cecil Corley Motor Co. v. Gen. Motors Corp., 380 F.Supp. 819 (M.D.Tenn.1974). There was an uncontroverted showing that a fair share of available automobiles was furnished to Vincent, and there was an absence of any causal connection between the number of cars allocated and the nonrenewal
 
 
 [29]
 Colorado Pump and Supply Co. v. Febco, Inc., 472 F.2d 637, 641 (10th Cir.), Cert. denied, 411 U.S. 987, 93 S.Ct. 2274, 36 L.Ed.2d 965 (1973); Volkswagen Interamericana, S. A. v. Rohlsen, 360 F.2d 437 (1st Cir. 1966); Ship and Shore Motors, Inc. v. British Leyland Motors, Inc., 1974-1 Trade Cas. P 75,102 (D.N.J.1974); United States v. J. I. Case Co., 101 F.Supp. 856 (D.Minn.1951)
 
 
 [30]
 Am. Motors Sales Corp. v. Semke, 384 F.2d 192 (10th Cir. 1967) (order certain unwanted models or risk being refused other models); Don Richard's Lincoln Mercury Jeep, Inc. v. Am. Motors Corp., 1976-1 Trade Cas. P 60,796 (D.Utah 1976) (relocate and carry full line or be terminated). Cf. David R. McGeorge Car Co. v. Leyland Motor Sales, Inc., 504 F.2d 52 (4th Cir. 1974), Cert. denied, 420 U.S. 992, 95 S.Ct. 1430, 43 L.Ed.2d 674 (1975) (where discrimination against a dealer who refused to handle a second line of automobiles was held to violate the Dealers' Act but to have had no causal connection with nonrenewal of the franchise)
 
 
 [31]
 "No provision of (the Dealers' Act) shall repeal, modify, or supersede, directly or indirectly, any provision(s) of the antitrust laws of the United States" 15 U.S.C. § 1224. We assume a reciprocal preservation of the reach of the Dealers' Act by the antitrust laws so that both types of statutes are to be afforded their full effect in view of each other
 The Franchise Act reaches those activities of an automobile manufacturer which would constitute an unreasonable restraint of trade under the Sherman Act or another invalid trade practice. In the lack of good faith evaluation the presence or absence of such invalid trade practices is, of course, a foremost consideration.
 Randy's Studebaker Sales, Inc. v. Nissan Motors Corp., 533 F.2d 510, 516 (10th Cir. 1976).
 We are mindful of the comment in Marquis at 641, in connection with its rejection of antitrust claims made there, that the Dealers' Act was intended to supplement the antitrust laws and that "every Dealers' Act violation will not necessarily amount to an actionable antitrust violation." The converse, no doubt, is also true, but far from precludes recognition of an inescapable relationship under the circumstances here.
 
 
 [32]
 The already discussed general standards for the review of summary judgment are applied even more strictly in antitrust context. Poller v. Columbia Broadcasting Sys., Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). See also Calnetics Corp. v. Volkswagen of America, Inc., 532 F.2d 674, 683-84 (9th Cir.), Cert. denied, 429 U.S. 940, 97 S.Ct. 355, 50 L.Ed.2d 309 (1976), Supra
 
 
 [33]
 E. g., First Nat'l Bank v. Cities Service Co., 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); Mut. Fund Investors v. Putnam Management Co., 553 F.2d 620, 624 (9th Cir. 1977); Bushie v. Stenocord Corp., 460 F.2d 116 (9th Cir. 1972)
 
 
 [34]
 Although the two distributing organizations regarded each other as competitors, since each up to that time had been selling either Triumph (LMS) or MG (BMCD) but not the other, this does not make the British Leyland Agreement appointing each to the full line in different sections of California a horizontal conspiracy to divide geographic markets, at least not less (sic) one disregards the fact that LMS is a wholly-owned subsidiary of British Leyland (emphasis added)
 British Leyland answering brief at 14-15.
 
 
 [35]
 Although this agreement was signed only by BLM and BMCD, Vincent contends that it is implicit in the writing and in the surrounding circumstances that LMS was deemed a part and parcel of the agreement. Those portions of the agreement relied upon by Vincent are these:
 "C. In exchange therefor, the Distributor (I. e., BMCD) is willing to surrender its distribution rights under the Northern Agreement, together with any claim that it may have for the renewal of such agreement, to BLM In order that BLM may through its subsidiary, Leyland Motor Sales, Inc. ('LMS'), add distribution of Austin, MG and Jaguar to its existing Triumph and Land Rover distribution." (CT 363; emphasis added.)
 "As of November 1, 1973, BLM shall have the right to transfer distribution rights to another distributor (Including LMS ) through all or any part of the Development Area described in the Northern Agreement." (CT 364; emphasis added.)
 "3. Transfer of Distribution. The Distributor and BLM (For itself and its subsidiary, LMS ) pledge themselves to effect transfer of distribution rights in an orderly manner and with minimum disruption of the supply of cars and spare parts to dealers. Neither the Distributor, BLM, Nor LMS will enter into any extraordinary contracts or commitments in connection with distribution operations to be transferred, . . ." etc. (CT 364; emphasis added.)
 ". . . if the amount determined under (2) is larger than (1), BLM Or LMS will pay the Distributor the net balance." (CJ 366; emphasis added.)
 "(e) The Distributor and BLM Or LMS will maintain records showing all sales under the foregoing provisions, and Each will supply to the other a statement signed by an officer and certifying as to the number of such sales." (CJ 367; emphasis added.)
 "(b) Without the prior consent of the other party, neither BLM (Nor LMS) nor the Distributor will renew or extend any dealer agreement now in force, nor will it appoint any new dealer or make any representations to any dealer as to his future status after transfer of distribution has been effected."
 "8. Warranties. BLM, For itself and for LMS, and Distributor each warrant and represent to the other as follows: . . ." etc. (CT 368, emphasis added.)
 Appellants' opening brief at 26, 27.
 
 
 [36]
 In so holding we do not foreclose the possibility that particular application of vertical restrictions might justify per se prohibition under Northern Pac. R. Co. But we do make clear that departure from the rule of reason standard must be based upon demonstrable economic effect rather than as in Schwinn (U. S. v. Arnold Schwinn & Co., 388 U.S. 365, 87 S.Ct. 1856, 18 L.Ed.2d 1249) upon formalistic line drawing
 Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. at 58-59, 97 S.Ct. at 2562.
 In Oreck Corp. v. Whirlpool Corp., 579 F.2d 126 (2d Cir.) (En banc ), Cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), the majority held because of the vertical nature of the restraint that the rule of reason applied, while Judge Mansfield, dissenting, considered the Per se rule to have been invoked because of involvements of a horizontal nature. See also Note, Vertical Agreements to Terminate Competing Distributors, 92 Harv.L.Rev. 1160 (1979). Despite some ambivalence that may be encountered in this troublesome area, the facts of the present case render it more likely that a horizontal rather than a vertical agreement was operative.
 
 
 [37]
 The question of whether a horizontal or vertical division was involved does not alter the effect of the proof tending to show that in either event there was a geographic division of the market. The fact that there was common ownership or control of contracting corporations did not liberate them from the impact of the antitrust laws, and in any event each Leyland appellee could be deemed as having conspired with the independent company, BMCD. See Perma Life Mufflers, Inc. v. Int'l Parts Corp., 392 U.S. 134, 141-42, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). Cf. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Ltd., 416 F.2d 71, 82 (9th Cir. 1969), Cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (recognizing this general rule but holding that purely intra-corporate conspiracy is not enough to invoke it)
 
 
 [38]
 In Gough v. Rossmoor Corp., 585 F.2d 381, 385 (9th Cir.), Cert. denied, --- U.S. ----, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979), this court said that "(u) nless the alleged anticompetitive conduct is per se unreasonable, the fact that the conduct restrained trade in a relevant market is an essential part of plaintiff's case . . . and the burden of establishing it lies on him."
 
 
 [39]
 Sherman's own experience supported such a market definition. Vincent points to statements by defendants' employees to the effect that Triumph and MG competed and that both competed with "sporty" cars imported from Japan, Italy and Germany in the same price range. A damage study undertaken by Professor David A. Aaker, submitted to the district court by plaintiff as an addendum to an interrogatory reply, not only supported plaintiff's definition of the relevant market but described the reduction of competition resulting from the Rationalization Program in that market as "significant" both on the retail and wholesale levels. Vincent claimed that dealers in the Triumph and MG automobiles had been reduced from five to one in the market while the combining of the MG and Triumph shares of the market under a single distributor in the San Gabriel Valley established approximately 59% Total share as a consequence of the Rationalization Program. The defendants presented little direct rebuttal of these claims, their primary effort being to question plaintiff's definition as to both the product and geographical markets. Their data as to lack of economic impact related primarily to their own definition of the relevant market rather than to that of the plaintiff
 Appellees suggested that the relevant market would be southern California rather than merely the San Gabriel Valley. Such does not appear from the record as a matter of law. Much less is there legal support for the contention made by BMCD in its reply to an interrogatory that "(p)laintiffs' competitors in the sale of Triumph automobiles, parts and accessories included all retail dealers of foreign and domestic automobiles in the general price range of Triumphs (from $2,995) in California and adjacent areas (such as Las Vegas)." BLM, LMS and BMCD in their replies to plaintiffs' interrogatories at another point said: "During the one year that Gary Sherman was a Triumph dealer under the name of European Imports, it is assumed that his competitors were all the retail dealers of automobiles selling in the general price range of Triumphs (from $2,995 to.$4,095) in the City of Pasadena and in a broader area of Los Angeles County." (Record p. 00210.)
 
 
 [40]
 Plaintiffs point out that when the motion for summary judgment was submitted below and when they filed their principal brief in this case, they had assumed in line with the district court's decision in GTE Sylvania that the rule was different than as finally approved by this court and the Supreme Court, and that without further discovery they have been handicapped in addressing the question of whether defendants' conduct was unlawful under the rule of reason. Since, however, their § 2 claims necessarily involved similar elements from the beginning, we shall evaluate the record in its present state
 
 
 [41]
 "(P)laintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each." Continental Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962)
 
 
 [42]
 It is true that the question of interchangeability within the claimed area has not yet been fully explored. But the entire question of relevant market where there are persuasive considerations advanced with respect to it, as here, is one of fact which we believe on the record before us it was inappropriate to resolve on summary judgment. Decisions holding that a single manufacturer's products cannot normally constitute the relevant market do not foreclose the plaintiff's claims as a matter of law, since plaintiff's position is that British Leyland products are only part of the relevant market. Nor does it appear as a matter of law that the Rationalization Program necessarily was lawful by reason of its procompetitive aspects
 
 
 [43]
 See Evanston Motor Co. v. Mid-Southern Toyota Distrib., Inc., 436 F.Supp. 1370 (N.D.Ill.1977); Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 212, 79 S.Ct. 705, 709-10, 3 L.Ed.2d 741 (1959): "Plainly the allegations of this complaint disclose such a boycott. This is not a case of a single trader refusing to deal with another, nor even of a manufacturer and a dealer agreeing to an exclusive distributorship." Cf. St. Paul Fire & Marine Ins. Co. v. Barry, 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 923 (1978) (where the court broadly interpreted the concept of "boycott" in a McCarran-Ferguson Act context). Cf. Joseph E. Seagram & Sons, Inc. v. Hawaiian Oke & Liquors, Inc., 416 F.2d 71, 76-78 (9th Cir. 1969), Cert. denied, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970) (holding that the replacement of one exclusive distributor for another fell under a rule of reason rather than a Per se rule). See also Oreck Corp. v. Whirlpool Corp., 579 F.2d 126 (2d Cir.) (En banc ), Cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978)
 
 
 [44]
 This act provides in the only part that could be relevant here:
 It shall be unlawful for any person engaged in commerce, in the course of such commerce . . . to . . . make a sale or contract for sale of goods . . . machinery . . . or other commodities . . . for use . . . or resale within the United States . . . on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods . . . machinery . . . or other commodities of a competitor or competitors of the . . . seller, where the effect of such . . . sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.
 
 
 [45]
 In McGeorge there had been no proof that the tie-in between Triumph and Rover reduced competition. Nor did the case deal with any conspiracy aspects of the Rationalization Program. The decision was upon trial and in view of the factual finding that Leyland's conduct toward McGeorge did not impede competition. "(I)t is this fact which clearly distinguishes the case before us from the tie-ins which were condemned by the Court in Fortner Enterprises v. U. S. Steel, 394 U.S. 495, 89 S.Ct. 1252, 22 L.Ed.2d 495 . . . ." McGeorge at 58. Cf. Golden Gate Accept. Corp. v. General Motors, 597 F.2d 676 (9th Cir. 1979) (where this court rejected an antitrust claim because there was no allegation or evidence as to an adverse effect upon competition other than the fact that one distributor would be replaced by another. A related Dealers' Act claim also was rejected. That the circumstances were inapposite to those of the present case is demonstrated by the court's conclusion there: "GM did not act in bad faith by initially requiring that the Dealership be located at a specified (and previously agreed to) site. Thereafter, Kohlenberg prompted GM's actions by unilaterally breaching the location provision of the Agreement.")
 
 
 [46]
 As recently again recognized in Greyhound Computer Corp. v. IBM, 559 F.2d 488, 496 (9th Cir. 1977), Cert. denied, 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978), "(m)onopoly power is the power to control prices or exclude competition." See United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); American Tobacco Co. v. United States, 328 U.S. 781, 797, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946); Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc., 526 F.2d 1196, 1204 (9th Cir. 1975), Cert. denied, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976); Twin City Sportservice, Inc. v. Charles O. Finley & Co., 512 F.2d 1264, 1274 (9th Cir. 1975)
 It is required that the monopolist must have engaged in "willful" acts directed at establishing or retaining its monopoly "as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." United States v. Grinnell Corp., 384 U.S. at 571, 86 S.Ct. at 1704. But plaintiff need not show that such acts were of a kind that would be unlawful for an ordinary enterprise. Greyhound Computer Corp. at 498. In the last analysis a defendant's acts, otherwise lawful, must not be unreasonably restrictive of competition. See Gough v. Rossmoor Corp., 487 F.2d 373, 376 (9th Cir. 1973), Cert. denied, 429 U.S. 857, 97 S.Ct. 155, 50 L.Ed.2d 134 (1976).
 
 
 [47]
 Direct evidence of specific intent to control prices or destroy competition is not indispensable when the claim is "founded upon a substantial claim of restraint of trade" I. e., a § 1 violation. In these circumstances the requisite specific intent may be inferred. Trixler Brokerage Co. v. Ralston Purina Co., 505 F.2d 1045, 1051-52 (9th Cir. 1974); See Gough v. Rossmoor Corp., 585 F.2d 381 (9th Cir. 1978), Cert. denied, --- U.S. ----, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979). Market power is relevant to determining whether such an inference is proper; but where a § 1 violation "clearly exists", proof of market power is unnecessary to support an inference of specific intent. Hallmark Industry v. Reynolds Metals Co., 489 F.2d 8, 12-13 (9th Cir. 1973), Cert. denied, 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974). Even though the restraint effected may be reasonable under § 1, it may constitute an attempt to monopolize forbidden by § 2 if a specific intent to monopolize is shown. United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948). In attempted monopolization, as with monopolization itself, individual conduct may be measured against the same "reasonableness" standard governing concerted and contractual activity under § 1. See Appalachian Coals, Inc. v. United States, 288 U.S. 344, 360, 53 S.Ct. 471, 77 L.Ed. 825 (1933); Greyhound Computer Corp. At 505, n. 37. The requirement that there be a demonstration that a defendant's specific intent to control prices or destroy competition has a "dangerous probability of success" may be satisfied either by direct proof of market power, Janich Bros., Inc. v. American Distilling Co., 570 F.2d 848, 853 (9th Cir. 1977), Cert. denied, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978), or by inference from proven specific intent, Greyhound Computer Corp. at 504. Within the principles so explicated, we have concluded that the record is such as to have legally precluded the summary rejections of plaintiff's attempted monopoly claim. Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc., 526 F.2d 1196, 1205 (1975), Cert. denied, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976)
 
 
 [48]
 The evidence tending to establish an unlawful conspiracy coupled with that relating particularly to the attempted monopolization claim is sufficiently supportive of the conspiracy to monopolize formulation as to sustain against the motion for summary judgment the survival of plaintiff's claim on the latter theory also. In harmony with Pacific Coast Agricultural Export Ass'n at 1205, n. 13, we observe that possible jury consideration of the evidence concerning a conspiracy constituting an unreasonable restraint of trade must be kept in mind in determining the sufficiency of evidence to support both the attempted monopolization and conspiracy to monopolize charges without tight compartmentalization
 
 
 [49]
 In Marquis, at 640, this court in concluding that violation of the antitrust laws had not been made out, stated: "A manufacturer's refusal to deal with a distributor or a dealer does not violate the antitrust laws merely because it adversely affects the entity refused. In fact, such effects are immaterial when the refusal is 'for business reasons which are sufficient to the manufacturer . . . in the absence of any arrangement restraining trade.' Bushie v. Stenocord Corp., 460 F.2d 116, 119 (9th Cir. 1972) (quoting Ricchetti (v. Meister Brau, Inc.), 431 F.2d (1211) at 1214 (9th Cir.)) (footnote omitted)." Although the evidence there had already been developed for trial purposes, there was no showing of market effects, nor was there any indication of a conspiracy between competitors as here. Cf. Moore I, 473 F.2d 328 (9th Cir. 1973) (where the court on surely more satisfactory but still fragmentary economic data bearing particularly on monopoly issues, required the case to go to trial on the latter issues as well as on the primary issue of tying, and thus made possible later definitive and differentiating ruling in another leading case, Moore II, Supra, on the basis of a fully-developed record)
 
 
 [50]
 This agreement shall be deemed canceled, without further action by the Distributor (LMS) in the event of termination or cancellation of the Distributor's Distribution Agreement with (BLM) or upon the withdrawal for any reason of the right of the Distributor to purchase (Triumphs) and resell the same within the area within which the Dealer is located. The Dealer acknowledges that all of his rights under this Agreement are subordinated to, and conditioned upon the continuance of, the ability of the Distributor to supply the Dealer with the Products
 
 
 [51]
 Q. If any of the above events occur would the present dealer organization retain their franchise or would it revert to the privately owned distributor?
 A. We see no reason why a good dealer's franchise should not continue whoever the distributor may be.
 The council requested that in order to retain the Triumph dealer body's confidence a moratorium was (sic) declared on the appointment of new Triumph dealers. The Council also requested that in the event that any Triumph dealer now operating under a Zone should find himself operating under a private distributor after the rationalization was complete that British Leyland would retain control of Triumph dealer appointments and cancellations for a period of two years after the date of such distribution change.
 British Leyland agreed that the matter would be given consideration. (Record pp. 00380-81.)
 
 
 [52]
 Kuffel v. Seaside Oil Co., 11 Cal.App.3d 354, 90 Cal.Rptr. 209 (1970); Restatement (Second) Torts 530 (1977); 4 Witkin, Summary of California Law: Torts (8th Edition 1975) at p. 2717
 
 
 [53]
 The colloquy at the Triumph National Dealer Council Meeting of June 6, 1972 (prior to the last renewal of Vincent's franchise by LMS), from which plaintiff has abstracted the phrase on which it relies, also reveals in context that a change in distributorships would be possible, and that the statement was a general one with reference to the national situation
 
 
 [54]
 28 U.S.C. §§ 1821, 1920 (1976)